**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **ANDREW WARDELL**<br>*Plaintiff,*<br><br>v.<br><br>**SUNRUN, INC.**<br>*Defendant.* | **CA: 3:26-cv-474**<br><br><br>**PLAINITFF DEMANDS TRIAL BY JURY** |

## COMPLAINT AND JURY DEMAND

This action is commenced by ANDREW WARDELL (hereinafter "Plaintiff"), against

SUNRUN, INC. (hereinafter "Employer" or "Defendant"), to remedy and seek relief for

unlawful employment practices arising from violations of the Americans with Disabilities Act,

42 U.S.C. § 12112 (ADA), Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623(a),

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 and § 2000e-3 (Title VII), Conn.

Gen. Stat. 46a-60 et seq., Fair Employment Practices Act ("FEPA"), Wrongful Termination in

Violation of Public Policy.

## JURISDICTION AND VENUE

1. This Court has jurisdiction to hear the Complaint pursuant to 28 U.S.C. § 1331.

2. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C.
   § 1367. Plaintiff's state claims are so related to Plaintiff's federal claims in that they form part
   of the same case or controversy. Judicial economy, fairness, and convenience warrants this
   Court's exercise of supplemental jurisdiction over Plaintiff's state law claims.

3. This Court has personal jurisdiction over Defendant because Defendant has the requisite
   minimum contacts with the State of Connecticut and availed itself of the rights and privileges

1

in Connecticut by conducting interstate commerce, actively advertising to, and employing residents of Connecticut; this Court exercising personal jurisdiction over Defendant does not offend the traditional notion of fair play and substantial justice.

4. Venue of this action lies pursuant to 28 U.S.C. § 1391(b) because Defendant's place of business, the relevant records, and the alleged unlawful practices occurred and/or continue to occur within the state of Connecticut in the judicial district of this Court.

5. Venue of this action also lies pursuant to 42 U.S.C. § 2000e-5(f)(3) under two applicable factors: Plaintiff experienced a continued pattern of discrimination and retaliation by Defendant in Connecticut, and thus Connecticut is a "State in which the unlawful employment practice is alleged to have been committed"; additionally, Plaintiff would have been employed by Defendant in Connecticut but for Defendant's discrimination.

## **PARTIES**

6.  Plaintiff presently resides in the City of Southington, County of Hartford, within the State of Connecticut and formerly worked for Defendant at various retail locations across New England region.

7.  Defendant, Sunrun, Inc., ("Defendant Sunrun" or "employer") is a foreign for-profit corporation domiciled in Delaware  with a principal place of business in San Franscisco, California; Sunrun employed Plaintiff in Connecticut and directed his work activities out of Connecticut.

## **ADMINISTRATIVE PROCEDURES**

8. Charges of Discrimination were timely filed by Plaintiff with the Connecticut Human Rights Commission (CHRO) CHRO NO.: 2630205 Andrew Wardwell vs. Sunrun, Inc. on or about September 29, 2025 and the charges were co-filed with the Equal Employment Opportunity Commission (EEOC) EEOC NO.: 16A-2026-00148.

9. On or about February 26, 2026, Plaintiff received a Release of Jurisdiction from CHRO (CHRO NO.: 2630205) and subsequent to that, received a Right to Sue from the EEOC on March 4, 2026 (EEOC NO.: 16A-2026-00148), so as to file a Complaint in Federal Court.

10. This Complaint was timely filed after issuance of the Release of Jurisdiction and Right to Sue.

## FACTUAL ALLEGATIONS

11. On or about September 28, 2021, Plaintiff was hired by Sunrun Inc. (hereinafter "Sunrun" or "Employer") as a Clean Energy Ambassador (hereinafter "CEA")—a role later renamed to Retail Sales Advisor (hereinafter "RSA")—at their Rocky Hill, Connecticut location.

12. Sunrun is a provider of solar and other energy storage products primarily for residential customers.

13. Throughout Plaintiff's employment with Sunrun, his work met or exceeded employer's reasonable standards.

14. At the time of Plaintiff's hiring and at all relevant times, he had severe arthritis in his legs, lower back, hands, and shoulders.

15. Plaintiff also had bilateral neuropathy, asthma, and acute situational and obstructive apnea.

16. These conditions substantially limited one or more major life functions including standing and walking and/or was a dysfunction of a major bodily system.

17. Plaintiff also had a disability in the form of a speech impediment which affects only his speech when he has to read something written out loud but does not affect him in normal conversation.

18. At all times relevant, Plaintiff was a qualified person with a disability because he could perform the necessary job functions with or without accommodation.

19. Due to those medical conditions, and disabilities, Plaintiff obtained protection under the Americans with Disabilities Act (ADA) and state analogs with protections against disability

3

harassment, discrimination and retaliation, as well as obtaining rights to reasonable accommodation without undue hardship.

20. Plaintiff is a 65-year-old man and, upon information and belief, was one of the older employees in the New England region at Sunrun, but also substantially older than most relevant comparators and those who harassed him, discriminated against him, failed to accommodate him, and retaliated against him.

21. Thus, Plaintiff is entitled to protections under the Age Discrimination in Employment Act (ADEA) and state analogs with protections against age-based harassment, discrimination, and retaliation as well.

22. As a Retail Sales Associate (RSA), Plaintiff conducted solar energy appointment setting for sales at various retail locations throughout the New England region, including Costco, BJ's, Home Depot, and Lowe's.

23. Plaintiff's responsibilities included engaging potential customers by educating them on the benefits of solar energy, and appointment setting; after a period of time his responsibilities grew to include creating marketing materials, organizing in-store events, training new advisors, and maintaining product expertise in renewable energy and smart home technologies.

24. Plaintiff worked on a small team known as the "Diamond Dogs," which consisted of just one other team member and himself.

25. Initially, the "Diamond Dogs" lacked adequate support and guidance from their then-manager, Chris Sheehan (hereinafter "Mr. Sheehan"), whom Plaintiff only met once in or about October 2021; like others on the team, Plaintiff received little to no training during onboarding.

26. Around that time, during a region-wide meeting, Plaintiff spoke with Mr. Sheehan's supervisor, who informed him that Mr. Sheehan had been terminated earlier that same day, and that Plaintiff was now part of the team led by Scott Atkinson (hereinafter "Mr. Atkinson").

27. Under Mr. Atkinson's leadership Plaintiff's enthusiasm and commitment to his role grew even beyond what it was before.

28. Despite Plaintiff's worsening disability, he began consistently meeting—and at times exceeding—his sales quotas, which not all similarly situated members of the team were able to do.

29. Mr. Atkinson always treated Plaintiff as a valued and integral member of the team and he never viewed Plaintiff's disability as a burden; on the contrary, Mr. Atkinson made sure team events were accessible and arranged accommodations so that Plaintiff could attend and Plaintiff even began working some Sunday afternoons after church to contribute more fully to the team.

30. With that encouragement, the team achieved "21 Club" recognition multiple times, an honor awarded for exceptional sales performance; Plaintiff was proud to contribute to the back-to-back national competition wins, including one instance in or about November 2022 when Plaintiff participated from a hospital bed due to health complications.

31. At no point during that time did anyone on the team treat Plaintiff like an outsider because of his disability.

32. In or about July 2023,  Plaintiff applied for a higher-level position at Sunrun with the support of Mr. Atkinson.

33. Although Plaintiff did not get the job, having Mr. Atkinson's endorsement meant a great deal to him.

34. A few months later, in or about November 2023, Plaintiff learned about an upcoming management restructure in Sunrun's New England branch.

35. The restructuring split the RSAs from the FSCs—two departments that had traditionally worked closely together—and created a vacancy for a new director in the region.

36. Plaintiff and his team supported Mr. Atkinson for the position, but Sunrun selected an external candidate from California: Clinton Smith (hereinafter "Mr. Clinton Smith").

5

37. Mr. Clinton Smith was to arrive in or about January 2024 and became Mr. Atkinson's direct supervisor and, by extension, Plaintiff's indirect supervisor.

38. Prior to Mr. Clinton Smith's arrival, the same time, at the beginning in or about December 2023, Plaintiff was repeatedly verbally attacked by a coworker, Andrew Legnani (hereinafter "Mr. Legnani") because of his religion.

39. By way of brief background, Plaintiff is a member of the Church of Jesus Christ of Latter-day Saints, also known as the Morman Faith.

40. Plaintiff was forthcoming with information pertaining to his religion when Mr. Legnani would ask him questions.

41. However, when Plaintiff responded to those questions, Mr. Legnani often reacted with hostility, sarcasm, or overt disrespect, rather than engaging in good-faith dialogue or showing any willingness to understand;  Mr. Legnani's tone and body language would shift, and the conversations would quickly turn confrontational, leaving Plaintiff feeling uncomfortable and targeted.

42. For example, Mr. Legnani claimed that in order to be a "full-fledged Mormon," a person had to serve a mission.

43. When Plaintiff tried to explain that this statement was incorrect, Mr. Legnani brought up the priesthood and insisted—again from a Catholic perspective—that Plaintiff's religious structure was invalid.

44. Plaintiff explained that he is a High Priest in his church and that all worthy men and women can serve.

45. In response, Mr. Legnani made a demeaning comment about women that flustered Plaintiff even more, and then he went on to talk negatively about evangelicals and proselytizing; eventually, he

6

ended the exchange by turning to Plaintiff and saying something along the lines of, "[l]istening to heresy turns us to heretics."

46. In or about late December 2023, Plaintiff had an in-person conversation with Mr. Atkinson about Mr. Legnani's religious-based harassing behavior regarding the fact that Plaintiff was a member of the Church of Jesus Christ of Latter-Day Saints.

47. Plaintiff described his conversations with Mr. Legnani about religion that were offensive, hostile, and harassing to Mr. Atkinson.

48. On or about January 25, 2024, Plaintiff called Mr. Atkinson to complain about Mr. Legnani's discrimination and harassment.

49. In response, Mr. Atkinson told Plaintiff to write everything down and send it to him in an email, at which point he would forward Plaintiff's complaint to HR.

50. Plaintiff followed Mr. Atkinson's correct instructions.

51. On or about January 29, 2024, Plaintiff received a call from HR and was told that they would call him back to discuss his complaint.

52. Plaintiff never heard from HR again on this matter.

53. That experience, with HR showing no real interest in responding to Plaintiff's complaints is what kept him from raising complaints about his later bosses Mr. Clinton Smith and Mr. Devon Gall, as they perpetually harassed Plaintiff about his age, disability, and pushed him to work on his day off worship, against state and federal law, for longer than Plaintiff should have waited; notably, once Plaintiff did report them for that and took part in a whistleblowing incident, he then faced retaliation, which all eventually led to his medical leave and then constructive discharge in March of 2025, but not before suffering for more than a year at their hands.

54. In or about January 2024, when Mr. Clinton Smith first arrived, his demeanor towards Plaintiff was immediately and vastly different from how Mr. Atkinson had treated Plaintiff and his

disability, as well as how he had treated Plaintiff despite his advanced age as compared to his similarly-situated coworkers.

55. Mr. Clinton Smith seemed to prefer the younger and non-disabled coworkers of Plaintiff's, despite the sales successes and despite his own performance being on the same or similar levels as his younger, non-disabled similarly-situated coworkers.

56. As time went on, Mr. Clinton Smith increasingly made disparaging remarks toward Plaintiff— remarks that were rooted in both age and disability bias against him.

57. For example, during a meeting in or about April 2024, Mr. Clinton Smith presented an Excel spreadsheet ranking the top-performing stores based on sales; according to Plaintiff's own records, the data he shared was incorrect.

58. Specifically, Mr. Clinton Smith listed Plainville Lowe's and Newington Lowe's as Plaintiff's second and third best-performing stores, but Plaintiff had only worked in Plainville twice and had never worked in Newington at all.

59. Importantly, by Mr. Clinton Smith using those stores as benchmarks, it made Plaintiff's job performance numbers look far worse than they actually were.

60. In that meeting, Plaintiff raised these concerns, pointing out that the algorithm seemed flawed and he respectfully questioned why Costco, where Plaintiff had actually worked and performed well, was omitted entirely from the summary of his job performance.

61. Rather than address the specific, very important, and job-performance related issue Plaintiff raised, Mr. Clinton Smith publicly shut him down and mocked him in front of the team.

62. Specifically, Mr. Clinton Smith made comments suggesting that Plaintiff was "slow" and "visually impaired," which since he had recently started using a mobility chair (a powered wheelchair) and was substantially older than his coworkers.

63. Plaintiff and others he worked with took those comments as age and disability related harassment.

8

64. Mr. Clinton Smith also made comments along the lines of "you need to catch up" and that Plaintiff "needed new glasses."

65. Declining vision is an age-related stereotype.

66. Mr. Clinton Smith did not make that sort of comment to Plaintiff's similarly-situated younger, non-disabled coworkers.

67. Thus, Plaintiff took the "new glasses" comment as age related harassment.

68. Plaintiff took the "needing to catch up" comment, in the context stated, as related to his need for a wheelchair for his disability, and thus disability-related harassment.

69. Mr. Clinton Smith did not make that sort of comment to Plaintiff's similarly-situated younger, non-disabled coworkers.

70. In this public meeting, Mr. Clinton Smith also questioned Plaintiff's technical ability in a sarcastic tone, asking, "[a]re you an expert in Excel?"

71. While Plaintiff is not an expert, he is proficient in Excel and was raising legitimate questions about the accuracy of the data being presented.

72. A lack of technical proficiency is an age-related stereotype.

73. Thus, Plaintiff took that statement by Mr. Clinton Smith as age-related harassment.

74. Mr. Clinton Smith did not make that sort of comment to Plaintiff's similarly-situated younger, non-disabled coworkers.

75. Overall, during that public meeting, Plaintiff – and others - took Mr. Clinton Smith's remarks as disability and age-related harassment: namely, that they are less competent, less able to perform the job, and have less technologically capable.

76. Several coworkers expressed similar reactions to Mr. Clinton Smith's behavior to Plaintiff later.

77. One colleague, Justin Kelly (hereinafter "Mr. Kelly"), was so offended that he told Plaintiff that he would not be attending those meetings again.

78. When Mr. Kelly made this comment he was referring to Mr. Clinton Smith.

79. Mr. Kelly said something along the lines of, "[w]hat the hell is the matter with this guy?"

80. In or about May 2024, Plaintiff developed a thumb condition related to his disability that ultimately required surgery.

81. The condition made it increasingly difficult for Plaintiff to grip or support an iPad with his left hand.

82. As a result, Plaintiff dropped the device several times until it finally broke, which forced him to request a replacement from IT.

83. This was the second iPad Plaintiff had received from Sunrun, but neither replacement was due to any negligence on his part.

84. In fact, the first iPad had a defective battery that drained rapidly and required frequent charging; Plaintiff did his best to troubleshoot and manage the battery issue for as long as he could, but by early 2024 the issue became unmanageable and Plaintiff contacted IT for a replacement.

85. Mr. Clinton Smith thus knew that the first iPad was defective and the second Plaintiff dropped due to a disability-related condition that he knew about.

86.  In fact, Plaintiff explicitly told Mr. Clinton Smith that he was having difficulty handling the iPad; notably, Plaintiff was wearing a brace so it was evident that he had a motor difficulty with that hand which was eventually corrected months later through surgery.

87. In effect, Plaintiff was asking for some sort of accommodation to help him handle the iPad given his disability.

88. Notably, this request was not elevated to HR and no interactive process ever took place; instead, Plaintiff was discriminated against due to this disability as well.

89. Specifically, in response to Plaintiff's request for accommodation due to difficulty handling his iPad, Mr. Clinton Smith's response was not only dismissive it was discriminatory about his disability.

90. Specifically, Mr. Clinton Smith said only, "[c]an't you get that operated on?"

91. Plaintiff replied that he was trying, and Mr. Clinton Smith cut him off and just said, "[w]ell, figure it out."

92. In fact, this was yet another occasion where Mr. Clinton Smith mocked publicly and used it as a basis for another line of disability-related harassment.

93. For example, Mr. Clinton Smith commented, in front of a few coworkers, after Plaintiff had dropped the second iPad, that this would be the third iPad issued to him in three years.

94. This comment humiliated and degraded Plaintiff publicly.

95. Mr. Clinton Smith also threatened Plaintiff stating, "[y]ou don't want to start having to pay for it yourself."

96. Because Plaintiff received no support from management, he took it upon himself to find a solution for his disability-related issue holding his iPad.

97. Specifically, Plaintiff purchased and attached a mount to his mobility chair so that he could secure the iPad and use it without having to rely on his disabled hand.

98. Despite this initiative and dealing with Plaintiff's own accommodation, Mr. Clinton Smith continued unfairly targeting and harassing him for circumstances beyond his control.

99. For example, in or about June 2024, Mr. Clinton Smith introduced a new sales script that he wanted all RSAs to memorize and then record themselves reciting the script.

100. Because Plaintiff stutters when reading aloud—a symptom related to a different disability, a speech impediment—Plaintiff felt extremely uncomfortable with the requirement to record himself and requested permission to deliver the script in person instead.

101. Mr. Atkinson supported Plaintiff's request and understood his concerns.

102. However, Mr. Clinton Smith overruled Mr. Atkinson and rejected the idea; he instead continued to insist on a recorded version from Plaintiff despite his request for a very basic accommodation.

103. It was only because Mr. Atkinson advocated on Plaintiff's behalf that they were ultimately able to reach a compromise: Plaintiff would record an audio-only version of the script instead of a video.

104. This situation was yet another example of Mr. Clinton Smith's resistance to accommodating Plaintiff's disabilities.

105. Rather than making a simple adjustment that would have allowed Plaintiff to complete the assignment in a way that aligned with his disability and age-related needs, Mr. Clinton Smith insisted on making Plaintiff's work life as difficult as possible.

106. In or about June 2024, approximately three days after the sales script incident, Plaintiff needed assistance booking a same-day appointment while Mr. Atkinson was away.

107. At the time, Mr. Clinton Smith was the acting manager on duty, so Plaintiff called him and explained the issue he was facing.

108. As Plaintiff was wrapping up the call, he overheard Mr. Clinton Smith—who seemingly thought he had already hung up—speaking to someone in the background.

109. Mr. Clinton Smith insultingly referred to Plaintiff as "taking up space."

110. Hearing that comment was deeply upsetting to Plaintiff; he felt demeaned, humiliated, and as though his contributions were being dismissed outright simply because of his age and disability.

111. Plaintiff began to feel more strongly that Mr. Clinton Smith's attitude towards him, rooted in discriminatory bias, was his attempt to try to push Plaintiff out of his position through terminating him or forcing him into quitting.

112. Soon after, Mr. Clinton Smith elevated his attempts to make Plaintiff look bad, potentially to set him up for discriminatory termination.

113. For example, on or about July 2024, Plaintiff had a one-on-one meeting with Mr. Atkinson, which Mr. Clinton Smith joined virtually; during that meeting, Mr. Clinton Smith accused Plaintiff of posting negative comments in the team chat about store traffic.

114. This accusation was completely unfounded—Plaintiff had never posted anything negative; in fact, whenever other team members expressed frustration about store traffic, Plaintiff consistently responded with positive and encouraging messages to keep morale up.

115. Mr. Atkinson immediately recognized Mr. Clinton Smith's inaccurate accusation and defended Plaintiff, pointing out that Mr. Clinton Smith's accusation was incorrect.

116. In fact, when asked, Mr. Clinton Smith could not identify a single example of the so-called "negative comments" he claimed Plaintiff had posted.

117. Despite Mr. Atkinson's support, the meeting still felt hostile and degrading; it also made Plaintiff begin to feel that Mr. Clinton Smith was intent on getting him out of Sunrun either by termination or making his work so miserable Plaintiff would have to quit.

118. Knowing Mr. Clinton Smith had a target on my back, Plaintiff stopped posting in the team chat to be on the safe side.

119. Mr. Clinton Smith was clearly scrutinizing Plaintiff in a way that he did not scrutinize similarly-situated, younger, non-disabled coworkers, and had raised to the point of being willing to make false accusations against Plaintiff.

120. In or about August 2024, on a Saturday morning at Southington Lowe's—where Plaintiff always arrived early due to heavier morning traffic—Plaintiff received a call from Mr. Atkinson.

121. Mr. Atkinson explained that Mr. Clinton Smith had reported Plaintiff for allegedly checking into Skedulo, the app that alerts the store to our presence, *from home* instead of from the Southington Lowe's location.

122. Plaintiff immediately clarified that he had not checked in from home.

123. Plaintiff explained that when he opened Skedulo to investigate, it incorrectly showed his location on the south side of the Route 84 interchange, while the store is actually located on the north side; this kind of inaccuracy was not unusual—Skedulo was known for being unreliable, sometimes misreporting locations by several miles.

124. Additionally, and importantly, *Plaintiff lives less than 2,000 feet from the rear of the store*, which may have contributed to the app incorrectly registering his location.

125. What stood out most to Plaintiff was how closely Mr. Clinton Smith seemed to be monitoring him.

126. As the Northeast Director of Sales, Mr. Clinton Smith's level of scrutiny felt excessive and unusual.

127. Plaintiff felt that he was being singled out and targeted, and he strongly believed that Mr. Clinton Smith was looking for any excuse to push him out—specifically because of Plaintiff's age and disability.

128. Again, Mr. Clinton Smith as the Northeast Director of Sales did not scrutinize Plaintiff's non-disabled, younger coworkers in this manner.

129. From that day forward, Plaintiff began documenting his arrivals meticulously.

130. Plaintiff took screenshots of his check-ins on Skedulo and Workday, photos of the front of the store, and even Google Maps screenshots of his location.

131. Plaintiff felt he had no choice but to create a record to protect himself from further false accusations.

132. However, this extreme level of diligence of predicting the next attack and protecting against it was wearing on Plaintiff's health, emotional distress, and would eventually affect his performance.

133. In or about August 2024, Mr. Clinton Smith implemented a new policy requiring RSAs to make "donut calls" at the end of each day to report their performance to a manager and he began publicly posting employee sales rankings in the group chat using an "above the line" and "below the line" format; this approach created an atmosphere of competition and public shaming, especially for those whose names appeared "below the line."[1]

134. During a team meeting held around this time, Plaintiff raised this as a concern and was not only publicly shamed by Mr. Clinton Smith but he also attempted to pit Plaintiff against Mr. Atkinson.

135. Plaintiff continued to feel that anything he did raised an attack from Mr. Clinton Smith.

136. In or about late August 2024, employees were informed that Sunrun and Costco would be ending their partnership, as Costco had decided to stop offering solar services nationwide; the message made it clear this was a corporate-level decision and not a reflection of the performance of our sales team.

137. However, during a virtual meeting that Friday, Mr. Clinton Smith reprimanded Plaintiff and his team and implied that their conduct in Costco stores might have been to blame for the loss of the contract; however, later that day during a national company-wide call, it was confirmed that Costco's decision to exit the solar market was purely a business move and had nothing to do with the team's performance.

138. The contradiction between what Mr. Clinton Smith told Plaintiff and what the company confirmed publicly left Plaintiff feeling unfairly blamed and targeted.

---

[1] By way of brief background, Mr. Smith created a daily group chat where an hourly graph displayed which employees obtained appointments to be scheduled; at the beginning of each day all employees we "below the line" and if they were able to schedule two (2) or more appointments, they were "above the line".

139. That afternoon, Plaintiff also learned that Mr. Atkinson would be transferring to inside sales, and that Plaintiff would be reassigned to a team led by Devon Gall (hereinafter "Mr. Devon Gall") until Sunrun selected a permanent replacement.

140. This news caused Plaintiff significant concern; not only was Plaintiff losing Mr. Atkinson, who had always served as a buffer between him and Mr. Clinton Smith, but Plaintiff also had past interactions with Mr. Devon Gall and he was worse in his treatment of Plaintiff than even Mr. Clinton Smith.

141. The idea of working directly under Mr. Gall left Plaintiff feeling anxious and further distressed.

142. That weekend, Plaintiff became physically unwell from the stress; in the middle of the night, Plaintiff woke his wife—sweating, short of breath, with a racing heart and dizziness.

143. Plaintiff and his wife went to the hospital, where he was observed for eight hours and diagnosed with high blood pressure; Plaintiff was discharged with instructions to reduce his stress levels.

144. On or about September 2, 2024, Plaintiff's physician gave him the same advice: reduce stress.

145. In or around September of 2024, during a team meeting, Mr. Clinton Smith again publicly humiliated Plaintiff because of my disability.

146. During this meeting, which had to do with a Costco policy about *not* following patrons to the parking lot, which was prohibited, Mr. Clinton Smith shockingly stated to Plaintiff that Plaintiff would have higher numbers "if [I] chased people into the parking lot" and then Mr. Clinton Smith insultingly said (against Costco policy) "you should get that chair moving!"

147. In or about September 2024, Sunrun launched a new program called "Verified Oppties," which introduced an app that allowed customers to confirm in-store that they understood they were setting a real appointment with Sunrun, and while the system was unreliable and often failed to function properly, the company shifted its focus away from traditional sales performance and began pressuring RSAs to meet Verified Oppties targets instead.

16

148. Around this time, Plaintiff had a conversation with Mr. Clinton Smith about some of the difficulties Plaintiff was having navigating the new program.

149. Mr. Clinton Smith responded, again seeming to be harassing Plaintiff due to his age and/or disability, that "[m]aybe you need to charge your batteries."

150. Mr. Clinton Smith did not make such comments to similarly-situated, younger, non-disabled employees.

151. Following that interaction, Mr. Atkinson pulled Plaintiff aside and apologized for Mr. Clinton Smith's comment; it reinforced Plaintiff's belief that Mr. Clinton Smith routinely made demeaning remarks that targeted his disabilities and age intentionally, and Plaintiff was far from the only one aware of that fact.

152. As part of this Verified Oppties new protocol, the team were directed by Sunrun, and Mr. Clinton Smith, to mislead the customer to believe they were setting an appointment for an "energy assessment" and not tell them they were trying to sell them solar panels.

153. Plaintiff felt uncomfortable misleading customers.

154. In fact, Plaintiff had been informed that there were multiple appointments that when the sales person showed up, the customer was very surprised (and at times upset) that the appointment was not for an energy assessment to see how to save money but instead, was an appointment to spend money on solar panels.

155. Relatedly, as a practice – because Plaintiff values honesty and sees the same customers at stores on an ongoing basis – before setting an appointment, Plaintiff would pull up the satellite image show the person if there were a lot of trees covering the roof or not, to help the customer decide for themselves if they wanted to spend the time with a sales person doing a true estimate.

156. In fact, this used to be part of the appointment setting process with Sunrun.

157. However, with the new Verified Oppties protocol our business was doing the opposite.

17

158. Not only was Plaintiff banned from helping the client see the tree cover of their roof so they could make and informed decision about making an appointment with a solar panel sales person, but employees were directed to go the opposite direction and mislead the customers into thinking that they were getting a few energy assessment, just so as to get an appointment set.

159. Plaintiff raised complaints about this new Verified Oppties protocol being misleading and in fact he even reported that he reasonably believed it was "wrong, unethical, and fraudulent" to Mr. Clinton Smith in a meeting publicly; Mr. Atkison (my soon ex-boss) and Mr. Gall (my soon new boss) were also present when Plaintiff reported this.

160. Under the Connecticut whistleblower laws, this report is a protected activity and thus, Plaintiff was protected from retaliation following this report.

161. However, not only did the discrimination continue, Plaintiff began to be retaliated against and treated even worse after this event.

162. On or about September 26, 2024, Plaintiff underwent minor hand surgery, which forced me to take three days of PTO due to complications with anesthesia.

163. On or about October 11, 2024, after Mr. Atkinson had left, Mr. Clinton Smith divided up and changed our team; Plaintiff was reassigned directly to Mr. Devon Gall; on or about October 15, 2024, Plaintiff officially began reporting to him.

164. Almost immediately, Mr. Devon Gall, my new direct boss, began making harassing remarks related to my age and disabilities.

165. Mr. Devon Gall's tone and treatment of me echoed the behavior Plaintiff had endured from Mr. Clinton Smith over the prior ten months, but in many ways, Mr. Devon Gall's conduct was even more direct and aggressive.

166. While Plaintiff had managed to cope with Mr. Clinton Smith's harassment due to the steady support Plaintiff received from Mr. Atkinson, once Mr. Atkinson was gone, that support system disappeared.

167. With Mr. Devon Gall now acting as Plaintiff's direct supervisor, the situation deteriorated rapidly.

168. The hostility Plaintiff experienced from Mr. Devon Gall, in addition to Mr. Clinton Smith, throughout the winter of 2024 into early 2025 intensified, culminating in his increasing need for medical leave by the end of January of 2025 and early February of 2025, and his eventual constructive termination on or about March 31, 2025.

169. As to the extreme worsening of events once Mr. Devon Gall became my boss, in or about October 2024, during this time Plaintiff was attending physical therapy which he scheduled around his work time but sometimes came close to times of the team calls.

170. Despite knowing Plaintiff was at an approved physical therapy appointment just prior to a virtual meeting related to my disability, when Plaintiff joined a few minutes late Mr. Devon Gall responded sarcastically, saying, "Nice of you to join us," in a tone that suggested my tardiness was unwarranted.

171. Other coworkers immediately spoke up during the meeting, reminding Mr. Devon Gall that Plaintiff had been at physical therapy, but Mr. Devon Gall offered no apology.

172. Once again, Plaintiff was left feeling publicly humiliated and devalued due to his disability.

173. Then, critically, on a call in or about October 2024, Mr. Devon Gall laid out his new rule: employees would no longer be allowed to use the breakrooms or training rooms at Lowe's or BJ's where they worked; Mr. Gall required all employees to take all breaks and lunches in their vehicles instead.

19

174. For Plaintiff, this policy posed serious challenges because with a mobility chair, it takes considerable time and effort to set up and break down the ramps needed to enter and exit his vehicle.

175. The result was between the time to get to Plaintiff's vehicle, set it up for entry for breaks and lunch, then reverse the process, Plaintiff had no time to rest or eat.

176. Thus, Plaintiff approached Mr. Devon Gall for an accommodation – and to explain how this rule would affect him especially as the weather worsened.

177. Mr. Devon Gall responded that he would "look into alternatives," however, he never followed up with Plaintiff.

178. Plaintiff was requesting a reasonable accommodation to use the break room for breaks and to eat, or to find some other alternative reasonable accommodation to the new rule.

179. Plaintiff's request for accommodation was not elevated to HR or leadership.

180. No interactive process was ever initiated.

181. Sunrun failed to accommodate Plaintiff from October of 2024 until his constructive discharge in March of 2025.

182. Shortly after that conversation, during another team call, Mr. Devon Gall announced another change: the workweek would now be Wednesday through Sunday, instead of the usual Tuesday through Saturday.

183. Later that day, Plaintiff had a one-on-one phone call with Mr. Devon Gall where he explained that he normally observe Sundays for religious reasons.

184. Refusing to accommodate an employee's sincerely held religious beliefs or practices unless the accommodation would impose an undue hardship (more than a minimal burden on operation of the business) is a violation of Title VII and state analog laws.

20

185. Plaintiff stated that he was willing to help out when possible, given the schedule of times for his religious practice.

186. Mr. Devon Gall, in response, threatened Plaintiff's job stating, "[m]aybe this isn't the job for you," if Plaintiff could not comply with the new expectations.

187. Mr. Devon Gall's response is a clear violation of Title VII and state analogs for attempting to force Plaintiff to work on his day of worship and due to harassment in response to requesting a legally mandated accommodation, if not undue hardship.

188. Mr. Devon Gall had occasion to harass and pressure Plaintiff to work on his day of worship, in violation of Title VII and state analogs from that time in or around October of 2024 forward through his constructive discharge in March of 2025.

189. Plaintiff felt deeply shamed and harassed—not only because of his disability, but now because of his religion as well.

190. This treatment was in stark contrast to how Mr. Atkinson had always handled these issues.

191. Mr. Atkinson consistently respected Plaintiff's religious practices and accommodated his scheduling needs as to his day of worship.

192. Mr. Devon Gall, on the other hand, made Plaintiff feel like all of his faith, his age, and his disability were viewed as reasons to remove Plaintiff from his job.

193. Mr. Devon Gall treated Plaintiff differentially from similarly-situated younger, non-disabled coworkers who did not request an accommodation for his disability and one to not work on his day of worship, as well as continued to harass him for the same reasons, from that time in October of 2024 through Plaintiff's constructive termination in medical leave, and then subsequent constructive discharge in March of 2023.

194. On or about that same day in or around October of 2024, Plaintiff attempted to report this new discrimination by Mr. Devon Gall and left a voicemail for HR explaining the situation.

21

195. HR never responded.

196. Upon information and belief, HR never investigated, or attempted to take swift remedial measures, in response to Plaintiff's newest report of discrimination by the bosses.

197. The following week, in or about late October 2024, Mr. Clinton Smith confirmed during a team meeting that Mr. Devon Gall's new rules—including the revised workweek and the ban on using breakrooms—would be implemented company-wide.

198. Mr. Clinton Smith suggested employees eat lunch in their cars or at a nearby restaurant.

199. Again, for Plaintiff, he needed, and had a basis, for an accommodation to both rules; as stated, his mobility chair is extremely difficult to transfer in and out of his vehicle and that process takes up most of his allotted break time.

200. As a result, Plaintiff was effectively denied the ability to take proper breaks, including a proper lunch break due to failure to accommodate.

201. Further, the pressure to work on Plaintiff's Day of Worship, rather than accommodate this, continued.

202. With the inability to have anywhere to eat at work, along with pressure to work on Plaintiff's Day of Worship, in addition to the already long-standing and unremedied disability and age harassment and discrimination, his distress levels rose.

203. Plaintiff experienced ongoing and increased issues sleeping and blood pressure issues in addition to feeling anxious and distressed about and at work.

204. In or about late October 2024, Plaintiff had an appointment with his pulmonologist due to the aforesaid symptoms; after evaluation, it became clear that his symptoms stemmed from ongoing stress from his work environment.

205. On or about October 26, 2024, Plaintiff once again complained to Mr. Devon Gall about the no-breakroom policy that he had implemented and requested an accommodation *again*.

22

206. Plaintiff explained how difficult it was for him, as someone who uses a mobility chair, to take breaks in his vehicle—especially given the time it takes to set up and break down his equipment.

207. Mr. Devon Gall responded by saying he would "look into it," but quickly changed the subject.

208. Once again, despite a plain and clear request for accommodation was not elevated to HR or leadership and no interactive process was initiated; no accommodation was provided, considered, and Plaintiff was not even contacted about the request for accommodation.

209. Once again, Sunrun failed to accommodate Plaintiff from that time in October of 2024 through his medical leave, and then subsequent constructive discharge in March of 2025.

210. Moreover, Mr. Devon Gall began to retaliate against Plaintiff for his complaints about his treatment and the failure to consider Plaintiff's request for accommodation from that time in October of 2024 through his medical leave and subsequent constructive discharge in March of 2025.

211. For example, at that time, Plaintiff became aware that Mr. Clinton Smith had begun closely monitoring and nitpicking his daily work locations.

212. On one occasion, Mr. Clinton Smith falsely accused Plaintiff of manipulating the timekeeping system to steal funds on a day he was not even scheduled to work.

213. This baseless accusation, combined with the increasingly rigid and dismissive treatment from Mr. Devon Gall, made Plaintiff feel like he was under constant surveillance and suspicion, further contributing to his sense of being targeted because of his age, disability, and religion, as well as in retaliation for report to HR about discrimination and in retaliation for requests for accommodations.

214. In or about November 2024, on the day before Thanksgiving, Mr. Devon Gall brought gifts for everyone at the office.

215. Mr. Devon Gall's present to Plaintiff was yet another harassing insult; Mr. Gall gave Plaintiff a bag containing energy drinks, despite knowing that he cannot consume them due to his disability.

216. This was not new information—Plaintiff's inability to drink energy beverages had come up multiple times in previous conversations with Mr. Devon Gall.

217. Thus, Plaintiff took Mr. Devon Gall's "gift" as yet another form of targeting and disability/age harassment, as well as retaliation for two requests for accommodations for his disability and retaliation for his request for accommodation to not work on his day of worship.

218. In or about December 2024, Plaintiff was encouraged by a supervisor at his location to contact HR.

219. At the same time in or about December 2024, Plaintiff was physically struggling due to the ongoing harassment and discrimination; Plaintiff took about a week of PTO/medical leave at that time at the very end of December of 2024.

220. Notably, while Plaintiff was out of work, Mr. Devon Gall made inappropriate comments about Plaintiff to Ms. Bellview and another employee named Jeff Burke ("Mr. Burke").

221. Plaintiff was told that while he was out for medical concerns, due to the harassment from the age, disability, and religious discrimination as well as the growing retaliation, that Mr. Devon Gall reportedly said things like, "Andy should just retire."

222. Plaintiff was also told that while he was out of work, Mr. Devon Gall stated about Plaintiff, "[h]e qualifies for disability, why doesn't he just apply?"

223. These comments are expressly, and on their face, age and disability-related harassment and discrimination.

224. Upon Plaintiff's return to work, just after New Years in 2025, his performance did suffer due to the constant feeling of distress regarding the harassment, discrimination, retaliation,

24

securitization, and targeting, as well as due to the new "break" policy which often prevented him from having a break or eating a meal.

225. In or about mid-January 2025, Plaintiff received a text from Mr. Devon Gall expressing concern about his performance numbers.

226. Plaintiff responded he would welcome any assistance Mr. Gall could provide.

227. Mr. Devon Gall never provided any substantive feedback or attempted to help Plaintiff remedy his declining performance.

228. Mr. Devon Gall knew, and it is factually true that, Plaintiff's declining performance was directly related to his and at times his boss' constant feeling of distress regarding the harassment, discrimination, retaliation, securitization, and targeting, as well as due to the new "break" policy which often prevented Plaintiff from having a break or eating a meal.

229. The lack of support and ongoing harassment worsened Plaintiff's mental and emotional state; around this time, Plaintiff even started to experience crying spells that sometimes occurred at work.

230. For those reasons, Plaintiff had increasing difficulty working and increasing concerns regarding the state of his health.

231. Despite HR ignoring Plaintiff's first complaint about religious discrimination and his attempts at obtaining reasonable accommodations, and in return being treated worse by Mr. Devon Gall and Mr. Clinton Smith in retaliation, Plaintiff felt he had no choice but to reach out to HR again to get help.

232. On or about January 30, 2025, Plaintiff reached out to the head of HR, the Chief Legal and People Officer, Jeanna Steele (hereinafter "Ms. Steele") via with his written complaint via email.

233. In Plaintiff's email, he explained that as a 64-year-old RSA who uses a wheelchair, and that Plaintiff had been a successful employee since September 2021—earning significant

25

commissions and even achieving 21 Club membership—but that things took a drastic turn with the arrival of new bosses.

234. Plaintiff detailed how when Mr. Clinton Smith became his new supervisor, he began to feel targeted because of his age and the fact that he uses a wheelchair; Plaintiff described how Mr. Clinton Smith questioned his performance using inaccurate data, talked down to him, and demeaned him in meetings by telling Plaintiff that he "needs new glasses" or that he needs to "catch up."

235. Plaintiff explained that when Mr. Devon Gall joined in October of 2024, he further escalated the age and disability harassment Plaintiff had already suffered at the hands of Mr. Clinton Smith.

236. Plaintiff shared that Mr. Devon Gall mocked him for his age and disability, reportedly saying things like "why doesn't he just retire already—he's disabled he can get a disability pension."

237. Plaintiff explained that Mr. Devon Gall excluded him from lunch invitations other younger, non-disabled employees were invited to, Plaintiff reported that Mr. Gall had told a coworker not to work with him because he'd hold her back in her career, and reported that Mr. Gall had falsely accused Plaintiff of stealing time by claiming he was punching in from home.

238. In the email, Plaintiff explained how Mr. Devon Gall also changed the rules about where he could take breaks and lunch, and how he used to be able to take them in the breakroom, which worked well for him, but was required then to go to his car, which for someone in a wheelchair, is difficult; Plaintiff also reported that he requested to get a reasonable accommodation, but Mr. Gall refused.

239. Finally, Plaintiff shared how all of this had taken a toll on both his sales performance and his health.

240. Plaintiff reported in this email to HR that the way he was being treated—being excluded, accused, harassed and mocked because of his age and disability—was making him feel like he was being pushed out or set up to be fired because he was an older worker and had a disability.

26

241. Plaintiff also reported that his distress was so extreme it had caused him to vomit and he was seeking a therapist.

242. Plaintiff asked HR to respond as soon as possible because he did not know what else to do and needed help right away.

243. Plaintiff did receive a reply from Ms. Steele stating that someone from her team would reach out to better understand his concerns.

244. Plaintiff's call was set up with Moshin "Mo" Khan (hereinafter "Mr. Khan"), from HR for January 31, 2025, at 11:00 a.m.

245. On or about January 31, 2025, the day Plaintiff was scheduled to speak with Mo from HR, a coworker alerted him shortly before the call that Mr. Devon Gall was approaching Plaintiff's store location.

246. Plaintiff's call with HR was impending at 11:00 a.m.

247. Knowing that Plaintiff would not be able to speak freely about how Mr. Devon Gall had been mocking his age and mobility chair use, with Mr. Devon Gall present in the store, Plaintiff had no choice but to reschedule the call for later that same day at 1:00 p.m. when Mr. Devon Gall would normally be long gone from a store visit.

248. Mr. Devon Gall however, did not leave the store as he normally would in the normal amount of time.

249. Moreover, Mr. Gall seemed to be hovering in Plaintiff's area.

250. Plaintiff was concerned Mr. Gall knew from HR that Plaintiff had a call with HR about Mr. Gall. Nonetheless Plaintiff expected Mr. Gall to leave as normal.

251. However, Mr. Devon Gall did not leave as he normally did.

252. Mr. Devon Gall remained in the store and nearby; he also continued to hover around Plaintiff's location throughout the day.

253. For a period of time he was sitting in his car as well but it was unclear if he was coming back in.

254. Mr. Devon Gall's persistent presence in and around the store, sometimes quite near Plaintiff, when the time for his *rescheduled* call with HR approached at 1 PM, made Plaintiff so anxious he was sick to his stomach as he tried to work that day.

255. When Mr. Devon Gall was still present – longer than normally – near the time of Plaintiff's 1 PM call with HR, Plaintiff had no choice but to reschedule the call again.

256. Plaintiff and HR rescheduled the call for the following Monday, February 3, 2025, when Plaintiff knew he would not be at work and could talk without fear of having Mr. Devon Gall hover and overhear his reports about Mr. Gall and Mr. Clinton Smith's discriminatory and retaliatory behavior.

257. The events of January 31, 2025 were so overwhelming that, as soon as Mr. Devon Gall finally left the store, Plaintiff broke down emotionally and had to step outside to collect himself.

258. In addition to canceling Plaintiff's call with Mo, that same day, at approximately 2:12 p.m., Plaintiff sent yet another complaint email to Ms. Steele about how he had to cancel the call twice because Mr. Devon Gall was not leaving in the store as he normally did and that caused Plaintiff extreme distress.

259. Plaintiff emphasized that he urgently needed HR's support, as Mr. Devon Gall's actions felt intentional and directly targeted.

260. Plaintiff explained that he had rescheduled for Monday [February 3, 2025] when he was not scheduled to work.

261. The events of January 31, 2025 were so overwhelming and distressing that Plaintiff called out of work the following day and spent the weekend in a state of distress—unable to sleep, suffering from severe headaches, and battling constant anxiety.

262. Plaintiff's symptoms became so intense that on the date he was supposed to talk to Mo, after having to reschedule due to Mr. Devon Gall's hovering, that same day, that or about February 3, 2025, he had to make an emergency appointment with his primary care physician and was seen that same morning.

263. Plaintiff's doctor immediately ordered an EKG which showed that he was experiencing tachycardia.

264. Plaintiff described to his doctor the mental and emotional toll that the harassment at work had taken on him—crying spells, insomnia, and debilitating anxiety, as well as the tachycardia and high blood pressure.

265. After evaluating Plaintiff's symptoms, his doctor diagnosed him with Panic Disorder and Generalized Anxiety Disorder.

266. Plaintiff's doctor prescribed Lexapro and Xanax and strongly advised that he begin therapy which he did not long after.

267. During the visit, Plaintiff also explained to his doctor the repeated instances of harassment and discrimination he had faced from his employer Sunrun.

268. After hearing everything, Plaintiff's doctor told him bluntly, "[t]his is stress-induced; your blood pressure is actually good [but for the stress]."

269. Plaintiff's doctor made it clear that if Plaintiff remained in the same work environment, his health would continue to decline.

270. Plaintiff's doctor advised him firmly, "[y]ou need to do what you need to do and take leave, or it will not be good for your health."

271. Based on this evaluation, Plaintiff's doctor wrote him out of work until March 31, 2025, citing the severity of the work-related stress he was experiencing.

272. Plaintiff emailed this to his boss, Mr. Devon Gall, on February 3, 2025.

273. That same day, on February 3, 2025, Plaintiff emailed Ms. Steele of HR again because his doctor did not advise that in his current mental or physical state that Plaintiff re-live or re-explain the situation he had already explained to Sunrun in several emails.

274. In Plaintiff's email, he explained that the stress he had been experiencing at work due to the actions of Mr. Devon Gall and Mr. Clinton Smith has taken a serious toll on his health.

275. Plaintiff described symptoms such as high blood pressure, headaches, and difficulty sleeping, all of which have been getting worse over time.

276. Plaintiff re-reported that he tried to speak with HR the previous Friday, but Mr. Devon Gall showed up and refused to leave, preventing him from having a private conversation.

277. Plaintiff reported that as a result, he saw his doctor, who told him that his symptoms were caused by stress and panic stemming from bullying at work.

278. Plaintiff also explained that that his doctor was shocked by the treatment Plaintiff described and ordered him to take an eight-week medical leave to protect his health; Plaintiff further reported that his doctor had prescribed medication and recommended that he begin therapy.

279. Plaintiff informed HR that he would send the doctor's note as soon as he received it, and Plaintiff explained that he had to cancel his call with Mo because his doctor advised him that any discussion of work-related stress was not safe at this time.

280. Plaintiff *emphasized* that, even though he would be out of work, *he hoped the investigation into his complaints would continue so when he returned, he was not returning to a hostile environment.*

281. *In Plaintiff's email, he asked HR to update him by email while he was on leave as to the detailed reports of discrimination and retaliation  he had reported to HR* via email.

282. Plaintiff explained *that he needs to know if this situation will be addressed and resolved before he returned to work*.

283. Plaintiff expressed hope that Sunrun would take appropriate action and thanked HR in advance for their attention to this matter.

284. It was quite apparent from Plaintiff's email that he was in no shape to talk about the issues with Mo and had explained all in email.

285. Plaintiff also sent his medical note to Ms. Steele.

286. The following day, on or about February 4, 2025, Maureen Brown (hereinafter "Ms. Brown"), a lower-level member of HR, versus Ms. Steele who is the Chief Legal and People Officer responded.

287. Ms. Brown responded by telling Plaintiff that they do not collect doctor's notes directly and that he would need to contact Broadspire to initiate a leave of absence.

288. Plaintiff was given no assurances of an investigation or keeping him updated, or that anything at all would be done. All Ms. Brown said was, "I believe Mo has already tried reaching out to discuss your concerns and has shared information about our EAP and leave options."

289. Plaintiff's email to Chief Legal and People Officer, Ms. Steele, the day before – relaying that according to his doctor – Plaintiff was in a highly distressed state made it clear that he was not able to talk to Mo and provided all the information, including requests for an investigation, updates, and assurances of a safe environment to return to, in the email.

290. Again Ms. Brown disregarded all of this and ended stating, "We're happy to connect if you'd like to review anything or discuss further. Let us know how we can help!"

291. Plaintiff had already asked for help – explicitly – and asked for investigation, updates, and assurances of a safe environment to return to, in the email.

292. Ms. Brown disregarded all of this entirely.

293. Plaintiff uploaded his doctor's note and received verification of receipt from Broadspire later that day.

294. Plaintiff was out on medical leave from on or about February 3, 2025 through March 31, 2025.

295. Plaintiff started therapy on or around February 7, 2025 and was diagnosed with work-related anxiety and PTSD.

296. Despite asking for updates about what Sunrun was doing to address the harassment and discrimination, Plaintiff did not hear from anyone at Sunrun while on leave.

297. In or about mid-March 2025, one of Plaintiff's coworkers, Lexi (last name unknown), called to inform him that a "Notice to Improve" (NTI) report had been generated about Plaintiff while he was still out on medical leave.

298. This came as a complete surprise, as Plaintiff had not been informed of any such report by management or HR.

299. Out of concern, Plaintiff logged into his online employee portal—access to which Plaintiff still had despite being on leave—and found the NTI document.

300. The NTI report, under "Manager Evaluation" section curiously stated, "Thank you for meeting with me on 1/31 to discuss your performance during the 45-day period ending on the first of Feb."

301. This was false; Plaintiff did not meet with Mr. Devon Gall on January 31, 2025, or on any other date during that period, to discuss his performance or anything else.

302. In fact, as documented in Plaintiff's earlier communications, that was the date he was avoiding Mr. Devon Gall due to trying to talk to Mo from HR and Mr. Devon Gall hovered and stayed at the store, which as a result, caused Plaintiff to have to reschedule his call with HR; there was no conversation with Mr. Devon Gall that day at all as the NTI falsity stated.

303. The creation and submission of this NTI report while Plaintiff was out on protected medical leave—and based on a fabricated meeting—felt retaliatory and caused increased distress.

304. The document misrepresented facts and attempted to manufacture a performance issue during a time when Plaintiff was not actively working.

305. Plaintiff viewed this as yet another targeted action by Mr. Devon Gall, meant to discredit him and build a false narrative around his job performance while Plaintiff was seeking treatment for a medical condition *caused* by his harassment, discrimination, and retaliation.

306. The fact that Mr. Devon Gall would submit this report in Plaintiff's absence, with no opportunity for him to respond or clarify, further reinforced the toxic and discriminatory environment Plaintiff had been trying to escape.

307. During Plaintiff's medical leave, he attended a total of nine therapy sessions, from February 7, 2025 through March 27, 2025.

308. On or about March 28, 2025, Plaintiff's therapist issued a psychotherapy evaluation report.

309. In this report, Plaintiff's therapist confirmed that he had been experiencing panic attacks triggered by workplace treatment, that he had symptoms such as intense fear, tachycardia, hypervigilance, intrusive work-related thoughts, insomnia, and avoidance of anything that reminded him of the workplace.

310. Plaintiff's therapist noted that his symptoms were consistent with post-traumatic stress disorder (PTSD) and adjustment disorder with anxiety and depressed mood.

311. The report also notes that before the change in management, Plaintiff had enjoyed his job, felt respected by coworkers, performed well and took pride in his work; however, after new management took over, Plaintiff experienced a sharp decline in his mental health.

312. Plaintiff's therapist relayed that Plaintiff felt betrayed by his employer and particularly by Sunrun's New England Management.

313. During sessions, Plaintiff became visibly distressed when discussing the idea of returning to work, and his therapist observed that he exhibited PTSD symptoms whenever the subject was raised.

314. In the report, Plaintiff's therapist emphasized that a return to Sunrun could cause serious anxiety and would likely compromise his mental health.

315. Plaintiff's therapist recommended a combination of therapy, medical coordination, and workplace advocacy, noting that his long history of professional success suggested a good prognosis—if the hostile work environment could be addressed.

316. Bear in mind, Plaintiff was never contacted with any updates of an investigation or assurances that he would return to an environment that was safe from harassment, discrimination, and retaliation by Mr. Devon Gall and his boss, at times.

317. As it got closer to Plaintiff's return date of March 31, 2025, he began to have increased anxiety about returning to work since he had no reassurance anything would change or be different.

318. Plaintiff expressly asked for an investigation – and authorized (in fact requested) – contact during leave to update him as to what was being done.

319. Plaintiff had heard no such update the entire time he was out.

320. By March 18, 2025, Plaintiff saw his doctor and on the forms for Broadspire, they noted that he *still* had severe anxiety and panic attacks at the rate of 3-5 a week.

321. Plaintiff's doctor, in conjunction with his therapist, did not think returning to that work environment, without change, would be suitable for his health.

322. With no communication from Sunrun indicating that Plaintiff's concerns had been addressed or that any action had been taken regarding the hostile environment Plaintiff had previously reported, caused him increased distress.

323. By the end of March, Plaintiff came to believe that he could not—and no reasonable person could—return to that environment without risking further harm to their health and well-being.

324. On or about March 31, 2025, Plaintiff saw my physician, Dr. DeSantis, for an in-person evaluation.

325. During that appointment, Plaintiff and Dr. DeSantis discussed his decision not to return to Sunrun.

326. Plaintiff and Dr. DeSantis talked in detail about the severe impact the work environment had on Plaintiff's physical and mental health, including how the stress had also affected his marriage.

327. Dr. DeSantis is also my wife Rachel's primary care doctor, and the doctor noted that she had been more candid about how Plaintiff's job-related stress had strained the relationship.

328. Plaintiff and his partner both agreed that many of those problems had started to improve since Plaintiff had been away from the toxic environment at Sunrun.

329. Dr. DeSantis told Plaintiff that he was pleased with the progress Plaintiff had made during his medical leave; Plaintiff had joined the YMCA arthritis program, continued attending therapy, and had started making additional lifestyle changes.

330. Plaintiff's blood pressure that morning was 124/70, and in his office it was 124/72—the best it had been in a long time.

331. Based on my improvements and the stress Plaintiff continued to experience when thinking about returning, Dr. DeSantis determined that it was in his medical best interest not to return to Sunrun at all.

332. In a written note dated March 31, 2025, advising Plaintiff should not return to work on the date he was to return which was the next day.

333. Thus, on or about March 31, 2025, Plaintiff emailed Ms. Steele, Ms. Brown, Mr. Clinton Smith, Mr. Devon Gall, and Moshin "Mo" Khan (hereinafter "Mr. Khan"), an HR representative, and was constructively discharged.

334. In my email, Plaintiff explained that he had initially contacted HR at the end of January 2025 to report ongoing age and disability discrimination by his supervisors, Mr. Devon Gall and Mr. Clinton Smith.

335. Plaintiff reported after his reports, the harassment, the mistreatment intensified, and he was placed on medical leave beginning February 3, 2025, due to the toll it was taking on his health.

336. Plaintiff reminded the recipients that in his February 3rd email, he had specifically requested an investigation and asked for an update before returning to work but despite this, no one from HR or management followed up with him, except when Plaintiff was trying to obtain the documentation he needed to process his leave claim; even then, the company failed to provide what he needed, compounding his stress.

337. Plaintiff also emphasized that no one from HR had reached out to check on him about any investigation or the situation he would be returning to with respect to not just the harassment, discrimination, and retaliation, but the denied accommodations.

338. Only coworkers had shown Plaintiff any concern. Plaintiff explained that he never felt respected by Mr. Devon Gall or Mr. Clinton Smith, both of whom treated him differently because of his disability and age, and at times openly harassed him in front of coworkers.

339. Plaintiff concluded by explaining that the continued silence from HR and the failure to address the harassment had caused anxiety and other health issues, which his doctors could confirm.

340. After eight weeks under the care of both a physician and a therapist, Plaintiff was advised not to return to Sunrun for the sake of his mental and physical health.

341. Plaintiff wrote that no reasonable person would feel safe returning to the same workplace after being ignored and mistreated in this way.

342. Plaintiff made it clear that he was resigning only because he had no choice left and because he valued my health more than a job—even one he once loved.

343. Thus, Plaintiff was constructively discharged from Sunrun after three and a half years due to age and disability related harassment and discrimination, as well as retaliation for reports and retaliation for request for accommodation (both disability and religious-related).

344. On or about March 31, 2025 at around 4:51 PM, Plaintiff received a response to his email from Ms. Brown.

345. In Ms. Brown's email, Ms. Brown acknowledged the hardship he described and expressed that she was sorry Plaintiff had gone through such a difficult experience.

346. Ms. Brown then proceeded to rewrite history with respect to their "efforts" to address Plaintiff's reports and request for both an investigation and updates which fell flat.

347. Specifically, Ms. Brown noted that Mr. Mo Khan had attempted to contact Plaintiff on January 31, shared EAP and Wellbeing resources, and rescheduled a conversation for February 3rd at Plaintiff's request; she went on that Plaintiff did not respond, she said Mr. Mo Khan followed up with a voicemail and an email, and that after Plaintiff informed the company his doctor had advised against speaking, they respected that and sent additional guidance that same day.

348. There was no "guidance" sent by Mr. Mo Khan; he called *after* Plaintiff sent the Chief Legal and People officer, Ms. Steele, that his doctor had just taken him out of work for extreme distress so obviously Plaintiff would not be talking that day.

349. There was no guidance from Ms. Brown either – Plaintiff expressly asked for an investigation and updates, as well as to be assured his return would be to a safe environment and Ms. Brown's response ignored all of that entirely.

350. Ms. Brown also said that Mr. Mo Khan assisted Plaintiff on February 18th with leave documentation and that his request was resolved by February 19.

351. Notably, Mr. Mo Khan *only* helped Plaintiff with these documents, which is his job and likely required under state law or regulations, *but* like Ms. Brown and Ms. Steele disregarded anything to do with Plaintiff's reports, request for investigation, updates, and assurances.

352. Ms. Brown concluded by asking whether Plaintiff truly wished to move forward with his resignation and said that while the company would respect my decision.

37

353. The use of the word "resignation" indicates Plaintiff had a choice; he had no choice but to not return because of Sunrun's lack of action, and that opinion is supported by both Plaintiff's doctor and his therapist; thus, he was constructively discharged.

354. On or about May 23, 2025, Plaintiff received a COBRA notice regarding his medical coverage, which indicate that he was "terminated" on April 17, 2025.

355. Upon information and belief, Sunrun management, including Mr. Clinton Smith and Mr. Devon Gall, attempted to push Plaintiff out of his job through age, disability, and religious harassment, discrimination, retaliation for reporting the same, due to failure to accommodate, and retaliation for requesting accommodations, in violation of multiple federal and state law analogs.

356. As a direct and proximate result of Plaintiff's employer's multiple unlawful actions and omissions, he suffered loss of income, loss of earning potential, and other economic harm; Plaintiff has found it very difficult to get a job in a bank with a termination on my record; Plaintiff has also experienced humiliation, experienced defamation of character, and suffered a loss of standing in the community; Plaintiff suffered and continues to suffer from emotional distress and mental anguish. All damages continue to date.

## COUNTS

### COUNT ONE
*DISABILITY – HOSTILE WORK ENVIRONMENT / DISCRIMINATORY TERMS AND CONDITIONS*
***Violation of Americans with Disabilities Act 42 U.S.C. § 12112 (ADA)***

357.  Plaintiff incorporates by reference paragraphs 1-356 above as if fully set forth herein.

358.  Plaintiff was afforded protections against disability discrimination and hostile work environment pursuant to Americans with Disabilities Act 42 U.S.C. § 12112 (ADA).

359. Plaintiff was a qualified person with a disability, because he had one or more physical or mental impairment which substantially impacted or limited one or more major life functions and/or bodily systems.

360. However, Plaintiff was able to perform the necessary functions of his job at all times with or without accommodation.

361. Plaintiff was subjected to harassment and/or disparate treatment by Defendant's agents, because of his disabilities, which created a hostile work environment that changed the terms and conditions of employment.

362. Plaintiff's managers subject him to harassment and/or disparate treatment not bestowed upon similarly situated, non-disabled coworkers.

363. Because the harassment and/or disparate treatment was perpetrated by Defendant's agents, who were management level employees, Defendant was on notice of the hostile work environment and the unlawful disparate treatment due to Plaintiff's disability.

364. Despite knowledge, Defendant's agents failed to remedy the harassment and/or disparate treatment.

365. Defendant's agents not only discriminated against Plaintiff with individual disparate treatment, Defendant's agents also have a pattern or practice of systemic discrimination against persons with disabilities.

366. As a direct and proximate result of Defendant's intentional conduct including harassment and disparate treatment discrimination, Plaintiff experienced the damages aforesaid.

367. Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

368. Defendant is vicariously responsible for the acts and omissions of its agents under *Respondeat Superior.*

## COUNT TWO
### *DISABILITY - DISCRIMINATORY TERMINATION (CONSTRUCTIVE DISCHARGE)*
### *Violation of Americans with Disabilities Act 42 U.S.C. § 12112 (ADA)*

369. Plaintiff incorporates by reference paragraphs 1-356 above as if fully set forth herein.

370. Plaintiff was afforded protections against disability discrimination and thus discriminatory discharge (and constructive discharge) pursuant to Americans with Disabilities Act 42 U.S.C. § 12112 (ADA).

371. Plaintiff was a qualified person with a disability, because he had one or more physical or mental impairment which substantially impacted or limited one or more major life functions and/or bodily systems.

372. However, Plaintiff was able to perform the necessary functions of his job at all times with or without accommodation.

373. Plaintiff's managers subject him to harassment and/or disparate treatment not bestowed upon similarly situated, non-disabled coworkers.

374. As a direct and proximate result of the disability-based discrimination, Plaintiff was systematically and unjustly disciplined – also commonly known as "papering" Plaintiff's employment file - for pretextual reasons.

375. As a direct result of the harassment, disparate impact, and papering, Plaintiff experienced severe emotional distress due to the severe and pervasive treatment.

376. Plaintiff was forced to be on FMLA medical leave as a result of the treatment and distress.

377. Plaintiff, while on leave, felt he had no reasonable choice but to resign, in a constructive discharge.

378. No reasonable person in Plaintiff's situation would have been able to remain in that work environment.

40

379. But for Defendant's agents' discriminatory conduct, Plaintiff would not have been constructively discharged.

380. Defendant's agents not only discriminated against Plaintiff with individual disparate treatment, but Defendant's agents also have a pattern or practice of systemic discrimination against persons with disabilities.

381. As a direct and proximate result of Defendant's intentional conduct including harassment and disparate treatment discrimination, Plaintiff experienced the damages aforesaid.

382. Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

383. Defendant is vicariously responsible for the acts and omissions of its agents under *Respondeat Superior.*

## COUNT THREE
DISABILITY – *FAILURE TO ACCOMODATE*
***Violation of Americans with Disabilities Act 42 U.S.C. § 12112 (ADA)***

384. Plaintiff incorporates by reference paragraphs 1-356 above as if fully set forth herein.

385. Plaintiff was afforded protections against disability discrimination, and entitled to consideration of reasonable accommodations, including an interactive process upon requesting accommodation, pursuant to *the ADA.*

386. Plaintiff was a qualified person with a disability, because he had one or more physical or mental impairment which substantially impacted or limited one or more major life functions and/or bodily systems.

387. However, Plaintiff was able to perform the necessary functions of his job at all times with or without accommodation.

41

388. As such, Plaintiff was entitled to job accommodations that were reasonable and not an undue hardship.

389. Plaintiff requested reasonable accommodations as to several disability-related issues on several occasions to multiple persons in leadership.

390. Instead of offering an interactive process to evaluate possible accommodations, or even engaging in the interactive process, Sunrun targeted and disciplined Plaintiff for reasons related to his disability.

391. At no time did Sunrun offer Plaintiff, or even discuss with Plaintiff, a reasonable accommodation for his disabilities.

392. Thus, Plaintiff was unreasonably deprived of access to reasonable accommodation.

393. As a direct and proximate result of Defendant's intentional conduct including harassment and disparate treatment discrimination, Plaintiff experienced the damages aforesaid.

394. Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

395. Defendant is vicariously responsible for the acts and omissions of its agents under *Respondeat Superior*.

**COUNT FOUR**
DISABILITY – *HOSTILE WORK ENVIRONMENT / DISCRIMINATORY TERMS AND CONDITIONS*
***Violation of Conn. Gen. Stat. 46a-60 et seq. Fair Employment Practices Act ("FEPA")***

396. Plaintiff incorporates by reference paragraphs 1-356 above as if fully set forth herein.

397. Plaintiff was afforded protections against disability discrimination and hostile work environment pursuant to *Conn. Gen. Stat. 46a-60 et seq.*

42

398. Plaintiff was a qualified person with a disability, because he had one or more physical or mental impairment which substantially impacted or limited one or more major life functions and/or bodily systems.

399. However, Plaintiff was able to perform the necessary functions of his job at all times with or without accommodation.

400. Plaintiff was subjected to harassment and/or disparate treatment by Defendant's agents, because of his disabilities, which created a hostile work environment that changed the terms and conditions of employment.

401. Plaintiff's managers subject him to harassment and/or disparate treatment not bestowed upon similarly situated, non-disabled coworkers.

402. Because the harassment and/or disparate treatment was perpetrated by Defendant's agents, who were management level employees, Defendant was on notice of the hostile work environment and the unlawful disparate treatment due to Plaintiff's disability.

403. Despite knowledge, Defendant's agents failed to remedy the harassment and/or disparate treatment.

404. Defendant's agents not only discriminated against Plaintiff with individual disparate treatment, Defendant's agents also have a pattern or practice of systemic discrimination against persons with disabilities.

405. As a direct and proximate result of Defendant's intentional conduct including harassment and disparate treatment discrimination, Plaintiff experienced the damages aforesaid.

406. Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

407. Defendant is vicariously responsible for the acts and omissions of its agents under *Respondeat Superior.*

**COUNT FIVE**
DISABILITY - *DISCRIMINATORY TERMINATION (CONSTRUCTIVE DISCHARGE)*
*Violation of Conn. Gen. Stat. 46a-60 et seq. Fair Employment Practices Act ("FEPA")*

408. Plaintiff incorporates by reference paragraphs 1-356 above as if fully set forth herein.

409. Plaintiff was afforded protections against disability discrimination and hostile work environment pursuant to *Conn. Gen. Stat. 46a-60 et seq.*

410. Plaintiff was a qualified person with a disability, because he had one or more physical or mental impairment which substantially impacted or limited one or more major life functions and/or bodily systems.

411. However, Plaintiff was able to perform the necessary functions of his job at all times with or without accommodation.

412. Plaintiff's managers subject him to harassment and/or disparate treatment not bestowed upon similarly situated, non-disabled coworkers.

413. As a direct and proximate result of the disability-based discrimination, Plaintiff was systematically and unjustly disciplined – also commonly known as "papering" Plaintiff's employment file - for pretextual reasons.

414. As a direct result of the harassment, disparate impact, and papering, Plaintiff experienced severe emotional distress due to the severe and pervasive treatment.

415. Plaintiff was forced to be on FMLA medical leave as a result of the treatment and distress.

416. Plaintiff, while on leave, felt he had no reasonable choice but to resign, in a constructive discharge.

417. No reasonable person in Plaintiff's situation would have been able to remain in that work environment.

44

418. But for Defendant's agents' discriminatory conduct, Plaintiff would not have been constructively discharged.

419. Defendant's agents not only discriminated against Plaintiff with individual disparate treatment, but Defendant's agents also have a pattern or practice of systemic discrimination against persons with disabilities.

420. As a direct and proximate result of Defendant's intentional conduct including harassment and disparate treatment discrimination, Plaintiff experienced the damages aforesaid.

421. Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

422. Defendant is vicariously responsible for the acts and omissions of its agents under *Respondeat Superior.*

### COUNT SIX
### DISABILITY *FAILURE TO ACCOMODATE*
### *Violation of Conn. Gen. Stat. 46a-60 et seq. Fair Employment Practices Act ("FEPA")*

423. Plaintiff incorporates by reference paragraphs 1-356 above as if fully set forth herein.

424. Plaintiff was afforded protections against disability discrimination, and entitled to consideration of reasonable accommodations, pursuant to Conn. Gen. Stat. 46a-60 et seq. Fair Employment Practices Act ("FEPA").

425. Plaintiff was a qualified person with a disability, because he had one or more physical or mental impairment which substantially impacted or limited one or more major life functions and/or bodily systems.

426. However, Plaintiff was able to perform the necessary functions of his job at all times with or without accommodation.

427. As such, Plaintiff was entitled to job accommodations that were reasonable and not an undue hardship.

428. Plaintiff requested reasonable accommodations as to several disability-related issues on several occasions to multiple persons in leadership.

429. Instead of offering an interactive process to evaluate possible accommodations, or even engaging in the interactive process, Sunrun targeted and disciplined Plaintiff for reasons related to his disability.

430. At no time did Sunrun offer Plaintiff, or even discuss with Plaintiff, a reasonable accommodation for his disabilities.

431. Thus, Plaintiff was unreasonably deprived of access to reasonable accommodation.

432. As a direct and proximate result of Defendant's intentional conduct including harassment and disparate treatment discrimination, Plaintiff experienced the damages aforesaid.

433. Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

434. Defendant is vicariously responsible for the acts and omissions of its agents under *Respondeat Superior.*

**COUNT SEVEN**
AGE DISCRIMINATION – *HOSTILE WORK ENVIRONMENT / DISCRIMINATORY TERMS AND CONDITIONS*
***Violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623(a) (ADEA)***

435.  Plaintiff incorporates by reference paragraphs 1-356 above as if fully set forth herein.

436. Plaintiff was afforded protections against age discrimination and hostile work environment pursuant to Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623(a) (ADEA).

46

437. Plaintiff was subjected to harassment and/or disparate treatment by Defendant's agents, because of his age, which created a hostile work environment that changed the terms and conditions of employment.

438. Plaintiff's managers subject him to harassment and/or disparate treatment not bestowed upon similarly situated, younger coworkers.

439. Because the harassment and/or disparate treatment was perpetrated by Defendant's agents, who were management level employees, Defendant was on notice of the hostile work environment and the unlawful disparate treatment due to Plaintiff's age.

440. Despite knowledge, Defendant's agents failed to remedy the harassment and/or disparate treatment.

441. Defendant's agents not only discriminated against Plaintiff with individual disparate treatment, Defendant's agents also have a pattern or practice of systemic discrimination against older persons.

442. As a direct and proximate result of Defendant's intentional conduct including harassment and disparate treatment discrimination, Plaintiff experienced the damages aforesaid.

443. Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

444. Defendant is vicariously responsible for the acts and omissions of its agents under *Respondeat Superior.*

**COUNT EIGHT**
*AGE DISCRIMINATION – DISCRIMINATORY TERMINATION (CONSTRUCTIVE DISCHARGE)*
***Violation of Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623(a) (ADEA)***

445. Plaintiff incorporates by reference paragraphs 1-356 above as if fully set forth herein.

446. Plaintiff was afforded protections against age discrimination and hostile work environment pursuant to Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623(a) (ADEA).

447. Plaintiff's managers subject him to harassment and/or disparate treatment not bestowed upon similarly situated, younger coworkers.

448. As a direct and proximate result of the disability-based discrimination, Plaintiff was systematically and unjustly disciplined – also commonly known as "papering" Plaintiff's employment file - for pretextual reasons that were related based on Plaintiff's age.

449. As a direct result of the harassment, disparate impact, and papering, Plaintiff experienced severe emotional distress due to the severe and pervasive treatment.

450. Plaintiff was forced to be on FMLA medical leave as a result of the treatment and distress.

451. Plaintiff, while on leave, felt he had no reasonable choice but to resign, in a constructive discharge.

452. No reasonable person in Plaintiff's situation would have been able to remain in that work environment.

453. But for Defendant's agents' discriminatory conduct, Plaintiff would not have been constructively discharged.

454. Defendant's agents not only discriminated against Plaintiff with individual disparate treatment, but Defendant's agents also have a pattern or practice of systemic discrimination against older persons.

455. As a direct and proximate result of Defendant's intentional conduct including harassment and disparate treatment discrimination, Plaintiff experienced the damages aforesaid.

456. Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

457. Defendant is vicariously responsible for the acts and omissions of its agents under *Respondeat Superior*.

## COUNT NINE
AGE DISCRIMINATION – *HOSTILE WORK ENVIRONMENT / DISCRIMINATORY TERMS AND CONDITIONS*
**Violation of Conn. Gen. Stat. 46a-60 et seq. Fair Employment Practices Act ("FEPA")**

458. Plaintiff incorporates by reference paragraphs 1-356 above as if fully set forth herein.

459. Plaintiff was afforded protections against age discrimination and hostile work environment pursuant to *Conn. Gen. Stat. 46a-60 et seq*. Fair Employment Practices Act ("FEPA").

460. Plaintiff was subjected to harassment and/or disparate treatment by Defendant's agents, because of his age, which created a hostile work environment that changed the terms and conditions of employment.

461. Plaintiff's managers subject him to harassment and/or disparate treatment not bestowed upon similarly situated, younger coworkers.

462. Because the harassment and/or disparate treatment was perpetrated by Defendant's agents, who were management level employees, Defendant was on notice of the hostile work environment and the unlawful disparate treatment due to Plaintiff's age.

463. Despite knowledge, Defendant's agents failed to remedy the harassment and/or disparate treatment.

464. Defendant's agents not only discriminated against Plaintiff with individual disparate treatment, Defendant's agents also have a pattern or practice of systemic discrimination against older persons.

465. As a direct and proximate result of Defendant's intentional conduct including harassment and disparate treatment discrimination, Plaintiff experienced the damages aforesaid.

466. Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

467. Defendant is vicariously responsible for the acts and omissions of its agents under *Respondeat Superior.*

**COUNT TEN**
*AGE DISCRIMINATION - DISCRIMINATORY TERMINATION (CONSTRUCTIVE DISCHARGE)*
**Violation of Conn. Gen. Stat. 46a-60 et seq. Fair Employment Practices Act ("FEPA")**

468. Plaintiff incorporates by reference paragraphs 1-356 above as if fully set forth herein.

469. Plaintiff was afforded protections against age discrimination and hostile work environment pursuant to *Conn. Gen. Stat. 46a-60 et seq.* Fair Employment Practices Act ("FEPA").

470. Plaintiff's managers subject him to harassment and/or disparate treatment not bestowed upon similarly situated, younger coworkers.

471. As a direct and proximate result of the disability-based discrimination, Plaintiff was systematically and unjustly disciplined – also commonly known as "papering" Plaintiff's employment file - for pretextual reasons that were related based on Plaintiff's age.

472. As a direct result of the harassment, disparate impact, and papering, Plaintiff experienced severe emotional distress due to the severe and pervasive treatment.

473. Plaintiff was forced to be on FMLA medical leave as a result of the treatment and distress.

474. Plaintiff, while on leave, felt he had no reasonable choice but to resign, in a constructive discharge.

475. No reasonable person in Plaintiff's situation would have been able to remain in that work environment.

476. But for Defendant's agents' discriminatory conduct, Plaintiff would not have been constructively discharged.

477. Defendant's agents not only discriminated against Plaintiff with individual disparate treatment, but Defendant's agents also have a pattern or practice of systemic discrimination against older persons.

478. As a direct and proximate result of Defendant's intentional conduct including harassment and disparate treatment discrimination, Plaintiff experienced the damages aforesaid.

479. Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

480. Defendant is vicariously responsible for the acts and omissions of its agents under *Respondeat Superior*.


**COUNT ELEVEN**
*RELIGIOUS AND/OR ETHNIC – DISCRIMINATORY TERMS AND CONDITIONS*
***Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2***

481. Plaintiff incorporates by reference paragraphs 1-356 above as if fully set forth herein.

482. Plaintiff is afforded protections from religious and ethnic harassment and discrimination under Title VII.

483. Defendants subjected Plaintiff to severe and pervasive harassment and disparate treatment, as well as an unresolved hostile work environment, which changed the terms and conditions of employment  because of his religion.

51

484. Defendant's agents pressured, and harassed, Plaintiff about working on his Day of Worship, which is in violation of Title VII.

485. Defendants knew of the harassing and discriminatory conduct but failed to take swift, remedial action in violation of, *inter alia*, Title VII.

486. Plaintiff experienced the aforesaid and incorporated damages as a direct and proximate result of Defendants' intentional conduct.

487. Defendants' discriminatory conduct, policies, and practices were intentionally discriminatory, motivated by animus, impermissible, and unlawful considerations and violate, *inter alia*, Title VII.

488. Because Defendants' conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

489. Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

490. Defendants are vicariously responsible for the acts and omissions of its agents under *Respondeat Superior*.

## COUNT TWELVE
*RELIGIOUS AND/OR ETHNIC – DISCRIMINATORY TERMS AND CONDITIONS*
***Violation of Conn. Gen. Stat. 46a-60 et seq. Fair Employment Practices Act ("FEPA")***

491. Plaintiff incorporates by reference paragraphs 1-356 above as if fully set forth herein.

492. Plaintiff is afforded protections from religious and ethnic harassment and discrimination under Conn. Gen. Stat. 46a-60 et seq. Fair Employment Practices Act ("FEPA").

493. Defendants subjected Plaintiff to severe and pervasive harassment and disparate treatment, as well as an unresolved hostile work environment, which changed the terms and conditions of employment  because of his religion.

52

494. Defendant's agents pressured, and harassed, Plaintiff about working on his Day of Worship, which is in violation of FEPA.

495. Defendants knew of the harassing and discriminatory conduct but failed to take swift, remedial action in violation of, *inter alia*, FEPA.

496. Plaintiff experienced the aforesaid and incorporated damages as a direct and proximate result of Defendants' intentional conduct.

497. Defendants' discriminatory conduct, policies, and practices were intentionally discriminatory, motivated by animus, impermissible, and unlawful considerations and violate, *inter alia*, FEPA.

498. Because Defendants' conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

499. Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

500. Defendants are vicariously responsible for the acts and omissions of its agents under *Respondeat Superior*.

**COUNT THIRTEEN**
*WHISTLEBLOWER/WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY –
RETALIATORY TERMS AND CONDITIONS
CONSTRUCTIVE DISCHARGE*
***Violation of Common law Wrongful Termination in Violation of Public Policy***

501. Plaintiff incorporates by reference paragraphs 1-356 above as if fully set forth herein.

502. Plaintiff was afforded protections from retaliatory harassment and termination or constructive termination because of taking part in a protected activity, such as attempting to refuse to partake in and reporting to supervisors concerns of perceived violations of law

in Sunrun's new sales processes that were changed during his employment, as alleged above, under the common law claim of wrongful termination in violation of public policy.

503. Plaintiff engaged in protected conduct such as attempting to refuse to partake in and reporting to supervisors concerns of perceived violations of law in Sunrun's new sales processes that were changed during his employment, as alleged above.

504. Plaintiff such as attempting to refuse to partake in and reporting to supervisors concerns of perceived violations of law in Sunrun's new sales processes that were changed during his employment, as alleged above.

505. As a result of Plaintiff's protected activity, Plaintiff was subjected to retaliatory harassment and then constructive discharge by Defendant's agents.

506. But for Defendant's agents' retaliatory conduct, Plaintiff would not have been constructively terminated.

507. Defendant's agents' retaliatory conduct, policies, and practices were intentionally retaliatory, impermissible and unlawful.

508. Because Defendants' conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted

509. Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

510. There is no adequate statutory remedy for the retaliation, and constructive discharge, Plaintiff face due to his reports of concerns of perceived violations of law in Sunrun's sales process, as alleged above.

511. Defendant is vicariously responsible for the acts and omissions of its agents under *Respondeat Superior*.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court:

a. Order judgment for Plaintiff against Defendant on all Counts of the Complaint and declare that the practices detailed in this Complaint are unlawful;

b. Order, for all applicable Counts, that Defendant make Plaintiff whole by awarding appropriate back pay with interest, front pay, compensation for all other lost income including any losses of ongoing or future social security benefits, compensation for lost benefits, lost earning capacity, and all other relevant entitlements and emoluments;

c. Order, for all applicable Counts, that Plaintiff be awarded an amount of money which will fairly compensate Plaintiff for his mental anguish, emotional pain and suffering, damage to his reputation, loss of standing in the community, and other damages incurred;

d. Order, for all applicable Counts, that the Defendant pay Plaintiff's costs and reasonable attorney's fees resulting from this action;

e. Order, for all applicable Counts, that the Defendant pay punitive or exemplary damages, as appropriate to punish Defendant for their malicious conduct, recklessness conduct, and/or callous indifference to the statutorily and common law protected rights of Plaintiff;

f. Order, for all applicable Counts, multiple damages, where appropriate and sustained by proof.

g. Order, for all applicable Counts, that Defendant pay post-judgment interest where appropriate and allowable by law;

h.  Order, for all applicable Counts, that Defendant pay pre-judgment interest, including interest for all damages awarded to Plaintiff from the date the cause of action accrued, where appropriate and allowable by law;

i.  Retain jurisdiction of this action to ensure full compliance; and

j.  Order, for all Counts, such other relief to Plaintiff as this Court deems just and proper.

### DEMAND FOR JURY TRIAL

### *PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE*

March 30, 2026

Plaintiff
ANDREW WARDELL
By his attorney,

_/s/ Paige Munro-Delotto__

Paige Munro-Delotto, Ph.D., Esq.
CT Federal Bar #: ct30410
Munro-Delotto Law, LLC
400 Westminster St., Ste. 200
(401) 521-4529
(866) 593-9755 (fax)
Email: Paige@pmdlawoffices.com
*Counsel for Plaintiff*